**In re Velma SHARP, Debtor.**

**FCC NATIONAL BANK, Plaintiff,**

**v.**

**Velma SHARP, Defendant.**

**Bankruptcy No. 1–91–06664.**
**Adv. No. 1–92–0034.**

United States Bankruptcy Court, S.D. Ohio, W.D.

Jan. 31, 1992.

R. Scott Warner, Patterson, Rouch & Lease, Columbus, Ohio, for plaintiff.

Paul Lukey, Cincinnati, Ohio, for defendant, debtor.

## OPINION AND ORDER

J. VINCENT AUG, Jr., Bankruptcy Judge.

This Chapter 7 Debtor filed her petition for relief on November 7, 1991. Her unsecured debts totalled $20,176, and were incurred on three credit cards and one unsecured loan for $7,000. Ms. Sharp had no secured creditors.

On January 31, 1992, FCC National Bank ("FCC"), creditor and plaintiff herein, filed a complaint to determine the dischargeability of debt under 11 U.S.C. § 523(a)(2)(A). The Debtor answered and a trial was conducted August 21, 1992.

## FINDINGS OF FACT

1. On or about July, 1991, FCC established a Mastercard credit account for Ms. Sharp. The account had a credit limit of $5,000. There was no evidence presented as to how this account came to be established. FCC's counsel had no copy of a credit card application and was unfamiliar with FCC's method of issuing credit cards. There was no witness from FCC. Ms. Sharp remembered receiving a credit card solicitation in the mail during that period of time and mailing back her acceptance of the card, but did not recall what company had sent the solicitation. She did not remember filling out any type of application or applying independently for a card.

2. On May 29, 1991, Ms. Sharp was laid off from her job as assistant manager at a Hardee's restaurant, where she had been employed for the previous seven years. In June of 1991, Ms. Sharp's husband filed for divorce. At that time, Ms. Sharp's husband tried to persuade her to file bankruptcy, since he intended to file himself. Ms. Sharp resisted the request, confident that she would soon find employment. She testified that prior to losing her job she had always paid her bills and had a good credit history.

3. Beginning in June, Ms. Sharp received unemployment benefits of approximately $800 per month. In addition she received child support of $240 per month. During the summer months and into the fall of 1991, Ms. Sharp's monthly expenses were roughly $1300.

4. On August 8, 10, 20 and 25, Ms. Sharp used her FCC Mastercard to purchase goods at K Mart. With the exception of the first purchase, the other transactions were for $150 or less. The first charge, however, was for $814.08 for a stereo to replace the one taken by her ex-husband in the divorce. On August 27, Ms. Sharp made a small charge at Swallen's. On September 7, 1991, Ms. Sharp made a payment of $21 on the account. On September 12, Ms. Sharp used one of the checks that had been issued with the credit account to pay off her balance on a Continental National Bank credit card. The amount of this payoff was $2,109.16. On September 13, she used another check to pay off her balance of $1,229.59 with Sears.

There was no further activity on the account.

5. On October 16, 1991, Ms. Sharp met with her attorney and signed her bankruptcy petition. On November 7, the petition was filed.

### CONCLUSIONS OF LAW

Section 523(a)(2)(A) of the Bankruptcy Code provides in pertinent part that an individual debtor may not be discharged from any debt

(2) for money, property, services, or an extension or renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

■ A creditor seeking a ruling of nondischargeability bears the burden of proving the elements of nondischargeability, in this case establishing fraud, by a preponderance of the evidence. *Grogan v. Garner,* — U.S. —, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

Section 523(a)(2)(C) provides a presumption of nondischargeability for consumer debts owed to a single creditor and aggregating more than $500 for luxury goods and services incurred by an individual debtor on or within forty days before the order for relief, or cash advances aggregating more than $1,000 obtained on or within twenty days of the order for relief.

While Ms. Sharp's purchase of the stereo would fall within the "luxury goods" provision, the debt was incurred more than ninety days before the order for relief and thus the presumption is unavailable to FCC. Likewise, Ms. Sharp's cash advances were obtained some 55 days prior to the order for relief, and the presumption is again unavailable.

■ Without the presumption, FCC must show by a preponderance of the evidence

that Ms. Sharp obtained the credit purchases and cash advances through false pretenses, false representations or actual fraud. To do so, the creditor must prove the following: (1) that the debtor made a material representation, (2) that the representation was false or was made with gross disregard as to its truth, (3) that the debtor intended to deceive, (4) that the creditor reasonably relied on the false representation,[1] and that as a result, (5) the creditor suffered a loss. *In re Phillips,* 804 F.2d 930 (6th Cir.1986).

As pointed out by Judge Sellers in *In re Barger,* 85 B.R. 756, 760 (Bankr.S.D.Ohio 1988), although it is difficult in the credit card context to find that a cardholder made an overt misrepresentation to a creditor which gives rise to fraudulent conduct, a cardholder may by his conduct imply representations that are false and are the basis for a finding of credit card fraud. The presentation of a credit card and signing of a receipt may be fraudulent if the cardholder has no ability or intention of paying the debt at the time.

The *Barger* court presented a non-exhaustive list of factors to be considered when determining a cardholder's intent. The factors listed included:

■ 1. The length of time between charges made and the filing of the petition. In Ms. Sharp's case, all credit activity on the card occurred between August 10 and September 13, 1991, or approximately two to three months before the filing.

2. Whether or not an attorney has been consulted regarding bankruptcy protection prior to the charges being made. While Ms. Sharp testified that her former spouse urged her to file bankruptcy in June, she apparently did not take his advice and did not consult counsel until some time in September, after she began receiving collection calls and letters at her home on her previous husband's debts. She signed her peti-

---

1. In the recent case of *In re Ledford, et al.,* 970 F.2d 1556 (6th Cir.1992), the Sixth Circuit reiterated its previous position set forth in *In re Phillips,* 804 F.2d 930, 933 (6th Cir.1986) and *In re Ward,* 857 F.2d 1082 (6th Cir.1988) that even though there is no explicit provision in

§ 523(a)(2)(A) as there is in (a)(2)(B) that a creditor's reliance be reasonable, the Court nonetheless requires creditors asserting nondischargeability under subparagraph (a)(2)(A) to show that their reliance meets a loose standard of reasonableness.

tion in October. From what little evidence there is in the record on this point, it does not appear that she consulted an attorney prior to making the charges.

3. The number of charges made. The number of charges made by Ms. Sharp was minimal.

4. The amount of the charges. The amount owing on the FCC Mastercard account as of the filing the bankruptcy was $4,595.78.

5. The financial condition of the debtor at the time the charges were made. Ms. Sharp was in financial difficulty when the charges were made. Her monthly expenses exceeded her income by roughly $300.

6. Whether the charges were above the credit limit. The charges on Ms. Sharp's account never exceeded the $5,000 credit limit.

7. Whether the debtor made multiple charges on the same day. No.

8. Whether the debtor was employed. The debtor was unemployed.

9. The debtor's prospects for employment. The debtor's prospects for employment were thought to be good since she had seven years of management experience in the fast food industry. Ms. Sharp was actively seeking employment throughout the summer and fall of 1991.

10. The financial sophistication of the debtor. Ms. Sharp was not financially sophisticated. Her testimony was that she incurred the cash advances and paid off Sears and Continental National Bank because she believed she would be consolidating her bills. She testified that she knew nothing about bankruptcy when she paid these two creditors, leading to the conclusion that she was unaware of the policy against preferring some creditors over others and that she was likewise unaware that she could have listed these creditors in her bankruptcy and discharged her debts to them.

FCC's counsel made much of a payment reflected in the debtor's check register to Sears in February of 1992. He argued that this indicated that the debtor's purpose in paying off the Sears charge was to maintain good credit with Sears and that this somehow implied an intent to deceive. The debtor testified that she had destroyed her Sears card, although she could not remember when, and that the payment, which was for $12.08, was payment for merchandise purchased at the store. We do not find that this single payment three months after the petition was filed supports a finding of fraud.

11. Whether there was a sudden change in the debtor's buying habits. There was no evidence presented on this point.

12. Whether the purchases were made for luxuries or necessities. The stereo purchase was clearly for a luxury item; the other goods purchased are unknown.

Taking all these factors into account, and given the debtor's demeanor and the totality of the circumstances, we find that FCC has not met its burden of proving the elements of § 523(a)(2)(A) by a preponderance of the evidence. Assuming that the signing of a credit card receipt implies an intention to repay, it does not automatically follow that eventual nonpayment negates that intent. If that were the case, every credit card debt listed on every bankruptcy petition would be presumed to have been fraudulently incurred. While we concede that the facts of this case are close, we believe that this debtor incurred these debts believing she would be able to repay them, particularly since she was actively seeking employment in a field with employment opportunities. Further, there was no showing, not even the minimal showing reiterated by the Sixth Circuit in *In re Ledford*, that FCC had any reason to form any kind of opinion about Ms. Sharp's creditworthiness. It appears that this is a case where a credit card company issued a card with a pre-approved credit limit of $5,000.

Accordingly, the debt of $4,595.78 owing by Ms. Sharp to FCC National Bank is hereby DISCHARGED.

IT IS SO ORDERED.