**In re Susan CARRIER, Debtor.**

**COLONIAL NATIONAL BANK, USA, Plaintiff,**

v.

**Susan CARRIER, Defendant.**

**Bankruptcy No. 94 B 41788 (SMB). Adv. No. 94–8595A.**

United States Bankruptcy Court, S.D. New York.

March 23, 1995.

744

Robert L. Cohen, New York City, for plaintiff.

Susan Carrier, New York City, pro se.

**MEMORANDUM DECISION DISMISSING THE PLAINTIFF'S COMPLAINT**

STUART M. BERNSTEIN, Bankruptcy Judge.

The plaintiff, Colonial National Bank, USA ("Colonial") filed this adversary proceeding objecting to the dischargeability of the defendant's credit card debt in the approximate sum of $4,100.00. Colonial initially sought a determination of non-dischargeability under 11 U.S.C. § 523(a)(2)(A), § 523(a)(2)(B) and § 523(a)(2)(C), but withdrew the latter claim at trial. The gravamen of Colonial's claim is that in June, 1993, the debtor expressly misrepresented her annual income when she signed and returned a pre-approved credit card application that Colonial had solicited, and in August and September, 1993, impliedly misrepresented her intention and ability to repay certain charges and cash advances that she obtained through her use of the credit card.

The Court conducted an evidentiary hearing on March 7, 1995. It concludes that Colonial has failed to sustain its burden of proof, and as a consequence, dismisses the complaint.

## FACTS

During June, 1993, Colonial decided to target certain persons, including the debtor, for pre-approved Visa Gold cards. Colonial sent a solicitation package to the debtor, pre-approving a $5,000 credit limit. According to the usual procedures that Colonial followed, and before it offers a pre-approved credit card, Colonial conducts an extensive credit check of the targeted person, soliciting information from credit bureaus regarding the potential cardholder's outstanding credit, the timing and amount of payment, any pre-existing bankruptcies, and, in some cases, the proposed cardholder's income.

The Colonial solicitation sent to the debtor extolled the many benefits of possessing and using a Visa Gold card, and asked the debtor to complete, sign and return the application form prior to June 30, 1993, which she did. In completing the application, the debtor filled in the amount of her annual income, but the amount she wrote became the subject of dispute at trial. Colonial produced an illegible copy, prepared from a microfilm, of the debtor's signed application, contending that it showed that the debtor had listed her annual income as $40,000.00. The debtor acknowledged that she had completed and returned the application, but at first said that she did not recall the amount that she listed. Later she volunteered that the "$40,000.00" looked like "$18,000.00."

Regardless of what the application did state, no one can gainsay the debtor's poor financial condition. Recently divorced, she was working part-time earning approximately $600 per month in June, 1993. In 1992 and 1993, she reported total income, inclusive of alimony, in the amounts of $13,000.00 and $14,398.00, respectively. She owed approximately $16,000.00 in credit card debt, and another approximate $14,000.00 based on two

student loans. She was current on one of the loans, paying $100 each month, and no payments were yet due on the other loan. She was also paying approximately $300 to $400 each month against her credit card indebtedness.

At approximately the same time that the debtor returned the pre-approved application, she had decided to make a career change, starting her own consulting business as a "cross cultural trainer."[1] The debtor's unrefuted testimony was that there was a demand for this service and she knew people who made their living doing it. She expected that she would succeed, and devoted herself to her new venture. Toward that end, she took sales courses full time during the summer of 1993, and "networked" for the purpose of promoting her new business.

Following receipt of the debtor's signed application, Colonial issued the credit card to the debtor. Before issuing a pre-approved credit card, Colonial performs a second check which it characterized at trial as "backend screening." This involves determining that all necessary information is filled in, and checking for discrepancies. If there is a discrepancy in the income figure, Colonial performs a separate income verification unless the applicant states—which the debtor did—that he or she is self-employed. In that event, Colonial does nothing, and apparently makes its credit decision based upon disparate and unverified information. Colonial presented no evidence that it ever reviewed or considered the debtor's signed application.

Following its receipt, the debtor used the Colonial card for less than two months. She first charged for certain services on July 17, 1993, and did not charge for goods or services again until August 21, 1993. During the approximate three and one-half week period between August 21 and September 15, 1993, the debtor charged in excess of $1,500 for goods and services. These goods and services do not appear to be either expensive in amount or luxurious in nature, and the average charge slightly exceeded $100.00.

---

**1.** According to the debtor, a cross cultural trainer is one who helps foreign travelers acclimate to life in their destination country. The training is available to Americans travelling abroad, as well as foreigners coming to the United States.

Furthermore, the debtor's schedules confirm that on the petition date, her assets were quite modest. In addition, between August 9, 1993 and September 11, 1993, the debtor obtained ten cash advances aggregating $2,300.00.

The debtor never made any payments to Colonial in consideration of the charges and advances, or returned any of the goods or services for credit. The debtor contends that she intended to repay the charges and cash advances, but her ability to repay the Colonial credit card debt, as well as her other debts, depended upon the success of her new business. Consequently, if the business failed, she would not be able to repay the debts.

Unfortunately, the debtor's business did not succeed as she had hoped. Faced with the business set back, the debtor attempted to consolidate her debts, and thereby lower her monthly payments. She first sought a consolidation loan from a bank, but the bank would not grant it because the debtor had just started a new business. She then sought similar assistance from a budget counselling service, but it was also unable to help her because her debts exceeded her income.

The debtor filed her Chapter 7 petition on April 14, 1994.[2] Except for earrings valued at $50, the debtor's schedules list no nonexempt property. She lists approximately $14,000.00 in student loans, and an additional $20,000.00 in credit card debt, including the $4,100.00 owing to Colonial. The debtor confirmed at trial that this represented her financial position in June, 1993 as well as August and September, 1993. The debtor also listed monthly income of $1,472.42 and monthly expenses of $1,719.00. She testified that while her monthly income was approximately the same in August and September 1993 when she was using the Visa card, her monthly expenses were $300 to $400 higher because she was making payments on her credit cards at that time.

2. The debtor's bankruptcy papers are signed and dated February 2, 1994. The debtor did not explain the reason for the approximate 10 week gap between the signing and the filing. In the

## DISCUSSION

### A. Introduction

■ Section 523(a)(2)(A) excepts from discharge any debt for money, property or services "to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's ... financial condition." A party proceeding under this subsection must establish five elements: (1) a representation, (2) falsity, (3) scienter, (4) reasonable or justifiable reliance and (5) damage. *Kovitz v. Tesmetges (In re Tesmetges )*, 74 B.R. 911, 914 (Bankr.E.D.N.Y.1987), *aff'd,* 86 B.R. 21 (E.D.N.Y.), *aff'd without op.,* 862 F.2d 304 (2d Cir.1988).

Section 523(a)(2)(B) specifically addresses the non-dischargeability of debts brought about by the use of fraudulent written statements. It excepts from discharge, *inter alia,* debts arising in connection with money, property or services obtained by:

(B) use of a statement in writing—

 (i) that is materially false;

 (ii) respecting the debtor's or an insider's financial condition;

 (iii) on which the creditor to whom the debtor is liable for such money, property services, or credit reasonably relied; and

 (iv) that the debtor caused to be made or published with intent to deceive....

■ The proponent of non-dischargeability must prove each element by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 290, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991); *New York v. Sokol (In re Sokol )*, 170 B.R. 556, 560 (Bankr.S.D.N.Y. 1994), *aff'd,* 181 B.R. 27, 28–29 (S.D.N.Y. 1995). Exceptions to discharge must be literally and strictly construed against the creditor and liberally in favor of the debtor. *Community Mutual Savings Bank v. Landrin (In re Landrin )*, 173 B.R. 307, 310 (Bankr.S.D.N.Y.1994); *First Am. Bank v.*

absence of any contrary evidence, the Court assumes that there was no material change in the debtor's financial position between the two dates.

*Bodenstein (In re Bodenstein )*, 168 B.R. 23, 27 (Bankr.E.D.N.Y.1994); *Schwalbe v. Gans (In re Gans )*, 75 B.R. 474, 481 (Bankr. S.D.N.Y.1987).

**B. The Claim Under Section 523(a)(2)(B)**

 Colonial's claim of non-dischargeability under section 523(a)(2)(B) is necessarily based on the debtor's return of an application in which she allegedly stated that her annual income was $40,000.00; this is the only written statement of financial condition that the debtor submitted to Colonial. The Court ruled at trial that the copy of the microfilmed application was illegible, and the debtor contested the $40,000.00 figure.[3] In light of the paltry documentary evidence and disputed testimony, the Court concludes that Colonial has failed to sustain its burden of proof on this claim.[4]

**C. Claim Under Section 523(a)(2)(A)**

 Colonial's claim under section 523(a)(2)(A) represents the more common non-dischargeability litigation involving credit card debt. Each time a debtor uses her credit card, she impliedly represents that she has the intention and ability to pay the issuer for the charges she incurs. *See, e.g., FCC Nat'l Bank v. Sharp (In re Sharp )*, 144 B.R. 372, 374 (Bankr.S.D.Ohio 1992); *The May Co. v. Chech (In re Chech )*, 96 B.R. 781, 783 (Bankr.N.D.Ohio 1988); *Norwest Bank Des Moines, N.A. Card Services Division v. Stewart (In re Stewart )*, 91 B.R. 489, 494 (Bankr.S.D.Iowa 1988); *In re Buford*, 25

B.R. 477, 481 (Bankr.S.D.N.Y.1982). Further, the issuer's extension of credit constitutes both actual reliance and damages. Hence, in most credit card cases, as in this one, the issuer easily demonstrates the elements of representation, actual reliance and damage. The Court finds that in this case, the debtor's implied representation was false because she was unable to repay the charges, a fact demonstrated both by her financial situation at the time the charges and advances occurred, and also by her need to file a bankruptcy petition.

The credit card cases raise difficult factual questions, however, in connection with the "state of mind" issues: (1) did the debtor intend to deceive the issuer, and (2) did the issuer reasonably rely on the debtor's implied representation? This case is no exception. It is to these two issues that the Court now turns.

**1. Intent to Deceive**

 Few debtors admit an intent to deceive, and the creditor must prove that intent circumstantially. Courts have identified twelve factors to be considered in deciding whether the requisite wrongful intent exists:

1) The length of time between the charges and the filing of the bankruptcy;

2) Whether an attorney has been consulted concerning the filing of bankruptcy before the charges were made;

3) The number of charges;

4) The amount of the charges;

---

**3.** The debtor speculated that the figure in the application looked like $18,000.00. This hardly constitutes evidence of what the application says, and Colonial bears the burden of proof on that issue. The original (and probably the only copies) are or were in the possession of Colonial. If Colonial intends to prosecute non-dischargeability actions, and impose this Draconian sanction on a debtor, it must maintain and produce legible evidence.

But even if the Court accepted the debtor's testimony as an admission, it could not conclude, as Colonial argues, that the application is false or fraudulent. Colonial failed to prove that the debtor had not received $18,000.00 in income between June 1992, and June 1993, and there is no way to tell. Further, if the $18,000.00 refers to the debtor's projected 1993 income, Colonial has not demonstrated that it was knowingly false. The $18,000.00 estimate was provided approxi-

mately midway through 1993 during a period when the debtor was working part time. Although the debtor ultimately received income of only $14,398.00 in 1993, she did not work for approximately three months after she returned the application. Further, her new business failed to succeed.

**4.** In addition, Colonial failed to demonstrate that it actually relied upon the application, or the $40,000.00 figure that it ascribes to it. No one with personal knowledge testified that Colonial decided to issue a credit card to the debtor based upon the information provided in the application. Given the total disregard of its own internal procedures concerning any investigation into the debtor's creditworthiness that is set out below, the Court will not assume any such reliance.

5) The financial condition of the debtor when the charges were made;

6) Whether the charges exceeded the credit limit of the account;

7) Whether there were multiple charges on the same day;

8) Whether the debtor was employed;

9) The debtor's prospects for employment;

10) The financial sophistication of the debtor;

11) Whether the debtor's spending habits suddenly changed; and

12) Whether the charges were incurred for luxuries or necessities.

*Citibank F.S.B. v. Cox (In re Cox)*, 150 B.R. 807, 811–12 (Bankr.N.D.Fla.1992); *accord Bank One Columbus, N.A. v. McDonald (In re McDonald)*, 177 B.R. 212, 216 (Bankr. E.D.Pa.1994); *Signet Bank Card Center v. Brawner (In re Brawner)*, 124 B.R. 762, 765 (Bankr.N.D.Ill.1991).

■ The circumstantial proof of intent to deceive focuses upon the timing and the nature of the charges, and the debtor's financial situation when they were incurred. In this regard, this case does not involve "the time-honored tradition of the prebankruptcy Bermuda blowout," Harvey M. Lebowitz, *Bankruptcy Deskbook* at 464 (2d ed. 1990), in which the debtor went on a wild shopping spree on the eve of bankruptcy[5]. Here, the debtor incurred the credit card debt no earlier than six months before bankruptcy. Further, she had not consulted the refinancing and credit counseling entities before she incurred the charges, and never consulted a bankruptcy attorney. Thus, the timing of the charges (and advances) indicates that she was not contemplating bankruptcy at the time that she used the Colonial credit card.

Further, the nature and amount of the charges do not indicate that the debtor changed her buying habits to amass assets or property on the eve of bankruptcy. Although the debtor incurred charges or obtained advances over a relatively brief period, and sometimes more than once or twice each day, the charges and advances do not represent a deviation from what would appear to be the debtor's ordinary buying habits. The average charge slightly exceeded $100.00, and the average advance totalled $230.00. The advances, aggregating $2,300.00, approximate the debtor's living expenses during the period that they were obtained, which coincided with the three month period that she was unemployed. It appears, therefore, that the debtor was living off the Colonial card during the summer of 1993 while she was unemployed and attending business school.

Furthermore, the debtor stopped using the card before she reached her credit limit and before Colonial contacted her regarding her failure to make payments. The debtor used the credit card for the last time on September 15, 1993. After that charge, the card had a balance of $4,009.20, inclusive of finance charges but she still had $990.00 in credit. (Plaintiff's Ex. 2). There was no contact between the debtor and Colonial until October 7, 1993, and Colonial did not send a "legal letter" until November 17, 1993. (*See* Defendant's Ex. A). Despite the availability of nearly another $1,000.00 in credit, the debtor never used it.

The final branch of the Court's inquiry concerns the debtor's financial condition and sophistication. At the time of the charges, the debtor was unemployed, although she was taking courses and working toward a career which, according to her unrefuted testimony, offered financial opportunity. When she did work in the past, her monthly expenses exceeded her monthly income. In addition, the debtor, while obviously educated, was neither overly sophisticated nor un-

---

5. The enactment of Section 523(a)(2))(C) in 1984 took much of the air out of the "Bermuda blowout." It created a presumption of non-dischargeability as to consumer debts for "luxury goods or services" owing to a single creditor, aggregating more than $500.00 and incurred within 40 days before the order for relief, or extensions under an open ended credit plan aggregating more than $1,000.00 and incurred within 20 days of the order for relief. The 1994 Amendments, which are not applicable to this case, increased the consumer debt triggering limit to $1,000.00, but also extended the proscribed period on both luxury-related debt and open-ended credit extensions to 60 days. As noted above, Colonial withdrew its Section 523(a)(2)(C) claim immediately prior to the commencement of the trial.

sophisticated in the financial sense. She appears, however, to have possessed a naive expectation that her new career would succeed, and hence, solve her financial problems.

In the final analysis, the Court concludes that the debtor did not intend to deceive Colonial. In reaching this conclusion, the Court is mindful that debtors may often be unreasonably optimistic about their financial prospects. *See In re Buford,* 25 B.R. at 482. On the other hand, "[f]inancial hardship alone is insufficient to support a conclusion that the debtor intended to defraud creditors." *In re Cox,* 150 B.R. at 812. If it were otherwise, virtually all debtor obligations would be non-dischargeable. The Court finds that the debtor did not engage in an abusive or unusual pattern of using the Colonial card in contemplation of bankruptcy. Further, her financial expectations, while perhaps naive, and in hindsight unattainable, were not so objectively unreasonable as to render her implied representations deceitful.

### 2. Reasonableness of Reliance

The proponent of non-dischargeability under section 523(a)(2)(A) must demonstrate more than actual reliance; the proponent must also demonstrate that the reliance was reasonable. In the case of credit card transactions, where the issuer and the cardholder do not "deal" on each transaction, the cases recognize a twofold inquiry: (1) did the issuer have a reasonable basis to issue the card, and (2) did the issuer act reasonably in monitoring the card use? Given the brief period during which the debtor used the card, and therefore, the limited time and opportunity that Colonial would have had to monitor the card use, the second area of inquiry is inapplicable. Accordingly, Colonial must demonstrate that it had a reasonable basis to conclude that the debtor had the ability to pay for her charges when it solicited her acceptance of the Visa Gold card.

A credit card issuer who has no prior relationship with a prospective cardholder arguably has a duty to investigate the creditworthiness of that cardholder before it offers a pre-approved credit card. *See, e.g., Manufacturer's Hanover Trust Co. v. Ward,* 857 F.2d 1082, 1084–86 (6th Cir.1988); *In re*

*Sharp,* 144 B.R. at 375; *In re Chech,* 96 B.R. at 784; *First Nat'l Bank v. Hagedorn (In re Hagedorn),* 25 B.R. 666, 669 (Bankr. S.D.Ohio 1982); *cf. Chemical Bank v. Sigrist (In re Sigrist),* 163 B.R. 940, 948 (Bankr. W.D.N.Y.1994) (bank that issues "pre-approved" credit card to insolvent debtor without inquiring into solvency is not entitled to infer fraud from insolvent debtor's use of card). As a corollary, the issuer will be charged with the knowledge that its investigation would have revealed.

The Court need not determine if such a duty exists because, in this case, Colonial undertook it, recognizing the importance of investigating the prospective cardholder's creditworthiness. The Terms of Offer contained in the solicitation materials, which are couched in a manner that makes the solicited person the offeror, state:

> You must be able to verify the accuracy of all information I provide. *I must meet your creditworthiness requirements.* You may obtain reports, now or in the future, from the credit bureau(s) of your choice. If I ask, I will be given the name and address of any credit bureau providing a report. [Emphasis added].

(Plaintiff's Ex. 1).

In deciding whether to grant credit, Colonial makes a highly detailed inquiry regarding the nature, amount and payment history concerning the prospective cardholder's outstanding credit. A letter, dated January 3, 1995 from Colonial's attorney, Robert L. Cohen to the debtor, received in evidence as Court Ex. "1", states in pertinent part:

> Specifically, what is looked at in deciding to grant credit and the credit limit assigned include the number of open T/E (travel and entertainment) trades, the number of open revolving retail trades, the total credit limit of all open trades, the open installment trades, the number of all open personal revolving trades, the total credit limit of all open revolving trades, the total credit limit of all open Financial Revolving Unsecured Tradelines (FRUTS), the total of open trades, the number of collections inquiries older than six (6) months, the number of revolving trades

opened within twelve (12) months, the number of FRUTS opened within six (6) months, the number of retail charge-offs in twelve (12) plus months, the number of retail trade accounts greater than $500.00 in twelve (12) plus months, the number of historical 30 day delinquencies, the number of historical 60 day delinquencies, the highest credit limit of all open FRUTS, the number of open FRUTS with credit limits less than $2,500.00, the number of open FRUTS with credit limits greater than $2,500.00 but less than $5,000.00, the number of open FRUTS with credit limits greater than $5,000.00 but less than $7,500.00, the number of open FRUTS with credit limits greater than $7,500.00 but less than $10,000.00, the number of open FRUTS with credit limits greater than $10,000.00 but less than $25,000.00, the number of open FRUTS with credit limits greater than $25,000.00, the FRUTS utilization, the age of the file, the age of the newest trade, the number of individual accounts, the number of join [sic] accounts, the number of co-signor accounts, the number of revolving trades, the number of installment trades, the number of open trades.

According to the trial testimony, Colonial may also obtain information regarding the prospective cardholder's income, and as part of its "backend screening", verify any discrepancies in the income reported by the prospective cardholder. If one responding to the solicitation states that he or she is self-employed, Colonial does not verify the statement of self-employment or the amount of self-employment income that the cardholder listed.

Despite these impressive procedures and comprehensive inquiry, Colonial failed to prove at trial that it followed these procedures or conducted any inquiry with respect to the debtor. No one from Colonial testified, of his or her own personal knowledge, that Colonial conducted any investigation. And Colonial failed, at trial, to produce any documentation regarding such an investiga-tion. The Court finds, therefore, that in this instance, Colonial failed to follow its internal procedures and failed to conduct any investigation of this debtor's ability to pay for the credit she was "offering to accept."

Had Colonial conducted such an investigation, it would have discovered what the testimony and the debtor's schedules revealed.[6] She was insolvent, her expenses exceeded her income, she was already $30,000.00 in debt, including $16,000.00 of credit card debt (some of the unpaid charges dated back to 1992), and she was only making minimum monthly payments on her existing credit. Under the circumstances, if Colonial is correct that the debtor could not have had a reasonable basis to believe that she could pay the Colonial charges, then neither could Colonial. As a consequence, Colonial has failed to demonstrate that it reasonably relied upon the debtor's implied representation that she had the intention and ability to pay the credit card debt that Colonial was soliciting her to incur.

The complaint is, therefore, dismissed based upon Colonial's failure to sustain its burden of proof at trial. The foregoing shall constitute the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a), made applicable to this adversary proceeding by Fed.R.Bankr.P. 7052. Counsel for Colonial is directed to settle a judgment, on notice to the debtor, consistent with this memorandum decision.

---

6. The debtor testified that except for the Colonial debt and the making of certain monthly credit card payments, her financial condition in June, 1993 was substantially the same as it was at the petition date.