**In re Susan Kay GONZALES, Debtor.**

**FIRST DEPOSIT NATIONAL BANK, Plaintiff,**

v.

**Susan Kay GONZALES, Defendant.**

**Bankruptcy No. 94–3210.**

**No. 94–31787.**

United States Bankruptcy Court,
N.D. Ohio,
Western Division.

Nov. 8, 1996.

Lee R. Kravitz, Cleveland, OH, for Plaintiff.

Michael J. Bender, Jr., Lima, OH, for Defendant.

### MEMORANDUM OPINION
### AND DECISION

RICHARD L. SPEER, Chief Judge.

This cause comes before the Court after trial on the Complaint to Determine Dischargeability filed by First Deposit National Bank (hereafter "First Deposit"). At the trial, the parties were afforded the opportunity to present the evidence and make arguments they wished the Court to consider in reaching its decision. The Court has reviewed the arguments of counsel, evidence presented at trial, as well as the entire record in the case. Based upon that review, and for the following reasons, the Court finds that the debt for Six Thousand Seven Hundred Four and 33/100 Dollars ($6,704.33) is non–dischargeable.

### FACTS

The following facts are undisputed. In 1988, First Deposit granted Debtor's application for a Visa Gold credit card based on a positive credit report. For several years, the Debtor consistently made purchases and

payments on this account, while continuing to remain in good standing with First Deposit. During this time, Debtor was employed as a fire marshal with General Dynamics for approximately seven years with a yearly income of approximately Thirty Thousand Dollars ($30,000.00). In February of 1993, Debtor was laid off and began receiving unemployment compensation and sub–pay.

Debtor remained unemployed for some time. In late 1993, Debtor applied for employment with the Allen Correctional Institute (hereinafter "Allen Correctional") through the Ohio Department of Rehabilitation and Correction. Debtor testified that due to her previous experience she was confident that she would acquire a position as a correctional officer.

In December of 1993, the Debtor's Visa Gold credit card balance was approximately Five Thousand Dollars ($5,000.00), with a credit limit of Seven Thousand Dollars ($7,000.00). Also in late 1993, Debtor began taking cash advances on her other credit cards to make payments on her Visa Gold card. By making payments in this way, the account balance on the credit card was brought to zero. At trial, Debtor could not recall the reason for using cash advances on other credit cards to pay off the Visa Gold card.

In February of 1994, Debtor began making numerous and often large charges on her Visa Gold card. These charges were incurred notwithstanding the fact that Debtor stopped receiving employment and sub–pay in March of 1994, and was still unemployed. By April of 1994, Debtor incurred debt totaling Six Thousand Seven Hundred Four and 33/100 Dollars ($6,704.33). These charges included: two airline tickets to Florida in February totaling Three Hundred Forty–eight Dollars ($348.00), a rental car for Four Hundred Thirty–five and 87/100 Dollars ($435.87), two cash advances apparently for traveling totaling One Thousand Two Hundred Dollars ($1,200.00), and another cash advance in March for Two Thousand Seven Hundred Fifty Dollars ($2,750.00). Further, Debtor made charges at such stores as Mejiers, Wal–Mart, Hills, Shoe Carnival, Franks, Shottensteins, Petrie, and M.J. Raider, which total Nine Hundred Seventy–seven and 91/100 Dollars ($977.91) in a one month period from March 22, 1994, to April 21, 1994. During the time these charges were incurred the Debtor made two payments on the Visa Gold card which totaled One Hundred Forty–five Dollars ($145.00).

Debtor testified that the trips to Florida were taken because she and her fiance were thinking about relocating. Debtor also testified that part of the cash advances were used to put money down on a house in Florida, although no collaborating evidence of this was presented at trial. Debtor also explained that many of the charges were for items for her son's apartment, into which she was thinking of moving.

It wasn't until March 29, 1994, that Debtor took the Civil Service exam necessary for a position at Allen Correctional. Debtor testified that she was told when she took the exam that she would begin employment in a couple of weeks. However, no corroborating evidence was offered to support this statement.

Debtor asserts that when she was not offered a position in April of 1994, she began working as a waitress in addition to doing odd jobs in housekeeping in order to pay her bills. According to Debtor's Statement of Financial affairs, she earned Three Thousand Six Hundred Dollars ($3,600.00) in 1994. Debtor asserts that she made no more charges on the Visa Gold card after April of 1994. However, the balance at that time was close to the credit limit. Debtor made a payment of One Hundred Thirty Dollars ($130.00) in May.

Debtor did not receive any correspondence from Allen Correctional until she received a letter dated May 19, 1994. The letter informed Debtor that she had passed the Civil Service test, but that a background investigation must be completed before they would consider her for employment.

On July 22, 1994, Debtor filed a Chapter 7 Bankruptcy petition. The Debtor's schedules reflect that the Debtor's liabilities total Twenty–four Thousand Sixty–nine and 49/100 Dollars ($24,069.49), all of which is credit

card debt but for a Two Hundred Dollar ($200.00) debt to a health care provider.

On August 11, 1994, Debtor received a letter from a personnel officer at the Ohio Department of Rehabilitation and Correction. The letter stated that they had attempted to contact Debtor on several occasions by phone without result. Debtor claims this was because she had moved. However, Debtor does not explain why she would not have contacted them herself for a position she was so certain to receive. In October of 1994, Debtor did finally began to work at Allen Correctional. She resigned approximately six months later.

### LAW

The Bankruptcy Code provides in pertinent part:

**11 U.S.C. § 523. Exceptions to discharge**

(a) A discharge under section 727, 1141, 1228(a),1228(b), or 1328(b) of this title does not discharge an individual from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing or credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

### DISCUSSION

Determinations as to the dischargeability of debts are core proceedings pursuant to 28 U.S.C. § 157. Thus, this case is a core proceeding.

First Deposit brings this adversarial proceeding under § 523(a)(2)(A) of the Bankruptcy Code. 11 U.S.C. § 523(a)(2)(A). For a debt to be determined non–dischargeable under § 523(a)(2)(A), the following elements must be shown: (1) that the debtor made false representations; (2) the debtor knew the representations to be false; (3) that the representations were made with the intention of deceiving the creditor; (4) that the creditor relied on the representations; and (5) that the creditor sustained the alleged injury as a proximate result of the representations

having been made. *In re Phillips*, 804 F.2d 930, 932 (6th Cir.1986); *In re Martin*, 761 F.2d 1163, 1165 (6th Cir.1985). The standard for the creditor's reliance upon the debtor's false representation is that of justifiable reliance. *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). A preponderance of the evidence is the standard to be applied to dischargeability exceptions. *Grogan v. Garner*, 498 U.S. 279, 279–80, 111 S.Ct. 654, 655, 112 L.Ed.2d 755 (1991). In the present matter, all of the above elements except that of intention to deceive have been satisfied through stipulation. Defendant maintains that she did not have the requisite intent to deceive First Deposit.

This Court and others in this circuit have held that purchases made with a credit card carry with them an implied representation that the user has the ability and intent to pay for the charges incurred. *In re Higgs*, 39 B.R. 181, 184 (Bankr.N.D.Ohio 1984); *In re Chech*, 96 B.R. 781, 783 (Bankr. N.D.Ohio 1988); *In re Barthol*, 75 B.R. 305, 307 (Bankr.S.D.Ohio 1987); *In re Doggett*, 75 B.R. 789, 791 (Bankr.S.D.Ohio 1987); *In re Satterfield*, 25 B.R. 554, 557 (Bankr.N.D.Ohio 1982). See also *In re Ward*, 857 F.2d 1082, 1085 (6th Cir.1988). "Because direct proof of intent (i.e., the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred." *In re Long*, 124 B.R. 54, 56 (Bankr.N.D.Ohio 1991) quoting *Matter of Van Horne*, 823 F.2d 1285, 1287 (8th Cir.1987); *In re Weaver*, 139 B.R. 677, 679 (Bankr.N.D.Ohio 1992).

The Court may consider a number of factors in determining whether a charge–card debt should be non–dischargeable. The factors set out below are not intended to be exclusive, nor are all to be given equal weight. *In re Faulk*, 69 B.R. 743, 757 (Bankr.N.D.Ind.1986). Each decision must be made on a case by case basis, and individual factors may or may not be of assistance to the Court. *Id.* These factors have been employed by a number of courts and are as follows:

1. The length of time between the charges made and the filing of bankruptcy;

2. Whether or not an attorney has been consulted concerning the filing of the bankruptcy before the charges were made;

3. The number of charges made;

4. The amount of the charges;

5. The financial condition of the debtor at the time the charges were made;

6. Whether the charges were above the credit limit of the account;

7. Did the debtor make multiple charges on the same day;

8. Whether or not the debtor was employed;

9. The debtor's prospects for employment;

10. Financial sophistication of the debtor;

11. Whether there was a sudden change in the debtor's buying habits; and

12. Whether the purchases were made for luxuries or necessities.

*In re Doggett*, 75 B.R. 789, 792 (Bankr. S.D.Ohio 1987); *In re Jacobs*, 196 B.R. 429, 433 (Bankr.N.D.Ind.1996) (citing *In re Williamson*, 181 B.R. 403 (Bankr.W.D.Mo. 1995)); *In re Carrier*, 181 B.R. 742, 748 (Bankr.S.D.N.Y.1995); *Faulk*, 69 B.R. at 757. See also *In re Pursley*, 158 B.R. 664, 668 (Bankr.N.D.Ohio 1993); *Satterfield*, 25 B.R. at 557–58 (Bankr.N.D.Ohio 1982).

Upon consideration of the particular circumstances in the instant case, this Court concludes that the charges are nondischargeable. At the time the charges were made, the Debtor was unemployed, and unemployment compensation was ending. The Debtor was also heavily strapped with debt from other credit cards. The bulk of the debt on this card was incurred in only a two month period. The bulk of the charges appear to be for luxury items rather than necessities, such as trips to Florida and the purchase of consumer items far in excess of that usually necessary to maintain a household. The fact that the Debtor used other credit cards to initially bring this card balance to zero also raises questions. Though the Debtor stated that she stopped using the card in April when she claims to have realized that she would not receive employment that month as she anticipated, the balance of the card was already very close to its credit limit. Also,

the Debtor had already incurred a substantial portion of the debt before she took the Civil Service test, when she was allegedly told that she would be hired "in a couple weeks." Finally, the Debtor filed for bankruptcy on July 22, 1994, shortly before receiving a letter in evidence that an employer was looking for her, and only three months after her last charge.

The Debtor argues that while she may have been unreasonably optimistic about her financial prospects, financial hardship alone is insufficient to support a conclusion that the debtor intended to defraud creditors. *In re Carrier*, 181 B.R. 742, 749 (Bankr.S.D.N.Y.1995). Indeed, as this Court stated in its opinion denying summary judgment in this case, "Intent to deceive is a difficult element to establish, and although intent is generally inferred, courts have recognized that misconceived optimism is not uncommon to the financially distressed." *In re Gonzales*, 187 B.R. 183 (Bankr.N.D.Ohio 1995) (quotations omitted). However, considering the totality of the circumstances in this case, this Court nevertheless finds that Debtor did not incur this debt with the intention to repay. It has also been held that, "Such a gross disparity between the amount of debt and the means to pay, negatives both ability and intent to pay." *Satterfield*, 25 B.R. at 559, quoting *Southeast Services, Inc. v. Vegh*, 14 B.R. 345, 347 (Bankr.S.D.Fla. 1981). "The cardholder is obligated to use the card in good faith, and not with reckless indifference to one's actual circumstances." *In re Valdes*, 188 B.R. 533, 537–38 (Bankr. D.Md.1995).

For the foregoing reasons, this Court concludes that the debt at issue in this case is nondischargeable in the amount of Six Thousand Seven Hundred Four and 33/100 Dollars ($6,704.33). In reaching the conclusions found herein, the Court has considered all the evidence and arguments of counsel, regardless of whether or not they are specifically referred to in this opinion.

According, it is

***ORDERED*** that the Debt owed to First Deposit National Bank for Six Thousand Seven Hundred Four and 33/100 Dollars

($6,704.33) be, and is hereby, *NONDIS-CHARGEABLE.*