Benethel REMBERT, Appellant,

v.

CITIBANK SOUTH DAKOTA,
N.A., Appellee.

Benethel REMBERT, Appellant,

v.

AT&T UNIVERSAL CARD
SERVICES, Appellee.

CIV. A. Nos. 96–70317–DT, 96–70315–DT.
Bankruptcy No. 95–44168.
Adversary Nos. 95–4677, 95–4679.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 25, 1996.

David H. Lewiston, Adam L. Wiener, Southfield, MI, for Appellant.

Richardo I. Kilpatrick, Thomas A. Balinski, Rochester Hills, MI, for Appellees.

*AMENDED OPINION AND ORDER RE-VERSING THE RULING OF THE BANKRUPTCY COURT, AND GRANTING DISCHARGEABILITY OF APPELLANT'S DEBTS UNDER 11 U.S.C. § 523(a)(2)(A)*

BORMAN, District Judge.

The Court has before it Appellant Benethel Rembert's appeal of the Bankruptcy Court's decisions in the above two matters that were consolidated for trial. The Bankruptcy Judge held that Appellant's credit card debts to Appellees were not dischargeable under 11 U.S.C. § 523(a)(2)(A), which prohibits discharge from debts "obtained by false pretenses, a false representation, or actual fraud".

Having reviewed the parties' briefs and the transcript of the trial before the Bankruptcy Court, and having heard oral argument on August 27, 1996, this Court reverses the Bankruptcy Judge's decision and grants dischargeability of the debts in both cases for the reasons stated below.

*Background:*

Appellant Benethel Rembert has been gainfully employed by Chrysler Motors for almost 29 years. She currently works as an hourly wage factory inspector, earning between $36,000 and $45,000 per year, depending upon overtime pay.[1]

In January, 1990, Appellant opened a credit card account with Appellee Citibank South Dakota, N.A. ("Citibank"). In 1994, Appellant opened two credit card accounts with Appellee AT&T Universal Card Services ("AT&T"), one in April, and another in September. Both AT&T accounts provided Appellant with lines of pre-approved credit.[2]

---

1. In 1993, Appellant was injured in a car accident and was forced to take a couple of months off from work. Between 1994 and 1995, Appellant's pay was reduced by one third because she was unable to work overtime.

2. AT&T Investigations Manager Paul Patterson testified at trial that Ms. Rembert had been pre-approved for each of the two AT&T credit cards when she was sent letters requesting that she sign up to receive them:

Pre-approved solicitation is where the—basically, the credit check has been done prior to sending the application to the individual. It

In late 1994, Appellant began to suffer losses from gambling at the Windsor, Ontario, Canada Casino. As a result of the increasing debt, in November, 1994 Ms. Rembert obtained a second mortgage on her house in the amount of $28,000 and used some of the proceeds to pay on her debts to Appellees: on November 14, 1994 she paid $5,936 to Citibank and $3,051.86 to AT&T.[3]

In late November and December of 1994, Appellant obtained thousands of dollars in cash advances on Appellees' credit cards at Casino Windsor. She did not attempt to hide from Appellees her intended use of the money by obtaining these advances at less obvious locations and then transporting the funds to the Casino. Between June, 1994 and January, 1995, Appellant incurred gambling losses of between $18,000 and $24,000. Appellant did not obtain any cash advances on Appellees' credit cards after January of 1995.

Appellant testified at trial that at the time she was obtaining cash advances for gambling at Casino Windsor, she thought she would win back the money and repay the credit card debts. Nothing in her trial testimony evidences (1) that she gambled to lose money, or (2) that at the time of her gambling with these funds she did not expect to repay these debts.

In December, 1994 and January, 1995 Appellant made two payments totalling $2000 toward her Citibank debt. Appellant also made payments totalling $1,549.19 to AT & T from November, 1994 through March, 1995.

On April 20, 1995, Appellant filed a Petition for Bankruptcy under Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 701, et seq. Appellees Citibank and AT&T initiated adversary proceedings against Appellant, consolidated for trial, alleging that Appellant's debts to them were non-dischargeable under 11 U.S.C. § 523(a)(2)(A).

After a trial on January 10, 1996, the Bankruptcy Judge found that Appellant's state of mind, at the time she incurred the debts, exhibited a fraudulent intent, and therefore rendered her debts to Appellees non-dischargeable under § 523(a)(2)(A):

The Debtor testified here today that at the time she incurred the debts at issue, using these credit cards primarily for gambling purposes—she expected and knew that the only way she would be able to repay them was through gambling winnings. She also recognizes now, and it is of course objectively true, that is not a reasonable expectation.

* * *

[T]he Court concludes that by a preponderance of the evidence the Plaintiff has established that at the time she incurred this debt, the Debtor did not intend to repay, and knew that she would not reasonably be able to repay.

* * *

She may have hoped in her heart of hearts that she would be able to repay, but she knew that it was not objectively realistic, or real—or reasonable to have the ability or intent to repay.

Trial Transcript at 119–20.

The Bankruptcy Judge entered (1) an Order in favor of Appellee Citibank in the amount of $6,299.71 and (2) an Order in favor of Appellee AT&T in the amount of $5323.77. Appellant Benethel Rembert now appeals the Bankruptcy Court's decisions. This Court reverses, as clearly erroneous, the finding of the Bankruptcy Court that a preponderance of evidence established that at the time she incurred this debt, Ms. Rembert (1) did not intend to repay and (2) had reason to know that she would not be able to repay. This Court concludes that Appellees Citibank and AT&T have not met their evidentiary bur-

shortcuts the time needed to issue the card once requested.
Q. [Appellant's attorney] Okay. And when you say, "once requested," it means you're—are actually mailing them out, or mailing out applications to people, and saying, "hey, sign this, and then you can get the card"?
A. That is correct.

Q. Okay, and that happened on both of Ms. Rembert's cards; correct?
A. That is correct.
Trial Transcript at 76–77.

3. She also made the following payments from these proceeds to other creditors: $11,000 to M.B.N.A.; $3000 to Sears; and $1800 to J .C. Penney. Rembert, Trial Transcript at 24–28.

den—they have not established by a preponderance of the evidence that at the time she incurred her debts with. them, Ms. Rembert did not intend to repay those debts and/or knew that she would not reasonably be able to repay those debts.

*Discussion:*

"An appellate court reviews a bankruptcy court's decision to determine whether its factual findings are clearly erroneous and its legal conclusions, which are subject to de novo review on appeal, are correct." *In re Caldwell,* 851 F.2d 852, 858 (6th Cir.1988). The district court may not make its own independent factual findings.

■ A lower court's finding with respect to intent is a factual determination and therefore may be set aside only if clearly erroneous. *National Bank of Commerce v. Lazar,* 192 B.R. 161 (W.D.Tenn.1995). A finding of fact is clearly erroneous if, after examining the evidence, the reviewing court "is left with the firm and definite conviction that a mistake has been committed." *Anderson v. City of Bessemer,* 470 U.S. 564, 573, 105 S.Ct. 1504,.1511, 84 L.Ed.2d 518 (1985).

Title 11 U.S.C. § 523(a)(2)(A) provides:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money .. to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other .than a statement respecting the debtor's or an insider's financial condition.

■ In order to except a debt from discharge under § 523(a)(2)(A)[4], a creditor must prove the following elements: (1) the debtor obtained money through a material misrepresentation that at the time the debtor knew was false or made with gross reckless-ness as to its truth; (2) the debtor intended to deceive; (3) the creditor justifiably[5] relied on the false representation, and (4) its reliance was the proximate cause of loss. *In re McLaren,* 3 F.3d 958, 961 (6th Cir.1993). A creditor seeking to except a debt from discharge under § 523 must prove each element of its claim by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991). Exceptions to. discharge are to be strictly construed against the creditor. *In re Ward,* 857 F.2d 1082, 1083 (6th Cir.1988). The Congressional intent behind the Bankruptcy Code is to give the honest but unfortunate debtor a .fresh start. *Grogan,* 498 U.S. at 286–87, 111 S.Ct. at 659–60. The Sixth Circuit has pointed out that there is no justification for extending preferential protection to credit card companies:

This court rejects extending preferential protection, at the expense of other unsecured creditors, to credit card companies which profit from extending consumer credit at the risk of non-payment, which risk is factored into finance charges which are higher than the rates charged by other lenders.

*In re Ward,* 857 F.2d at 1083. The Court of Appeals further stated,

Banks are willing to risk non-payment of [credit card] debts because that risk is factored into finance charges. Because the risk is voluntary and calculated, Section 523 should not be construed to afford credit card issuers more protection than is given to all other creditors.

*Id.* (quoting *First Nat'l Bank of Mobile v. Roddenberry,* 701 F.2d 927, 932 (11th Cir. 1983)). AT&T Investigations Manager Paul Patterson testified that his company did not run any credit checks on Ms. Rembert during the period she was an AT&T cardholder.[6]

---

4. While § 523(a)(2)(A) lists three separate grounds for dischargeability:. actual fraud, false pretenses, and false representation, the Sixth Circuit has articulated this single. test to be applied to determine all three types of fraudulent acts.

5. The Supreme Court decision in *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) changed the Sixth Circuit *McLaren* reliance standard for creditors from the objective 'reasonable' standard, to the subjective 'justifiable' standard. This is not an issue in the instant case, because the focus is on the debtor's intent and not the creditor's.

6. Q. All right, over the months that Ms. Rembert had ·her cards and spent several thousands and got several thousands into AT&T, did you ever in the time period run a credit check on her to see

█ The type of fraud which comes within the ambit of § 523(a)(2)(A) is actual fraud, which involves moral turpitude or intentional wrong. *In re Phillips,* 804 F.2d 930, 932 (6th Cir.1986). Fraud implied in law, or which may exist without imputation of bad faith or immorality is insufficient. *Collier on Bankruptcy* ¶ 532.08(4). In order to prove actual fraud, it is necessary to show that the debtor intended to deceive the creditor in an attempt to obtain money. *In re McLaren,* 3 F.3d at 961. If room exists for the court to infer honest intent, the issue of dischargeability must be decided in favor of the debtor. *In re Johnny Mac Roberts,* 193 B.R. 828, 830 (Bkrtcy.W.D.Mich.1996).

█ The factual evidence at the instant trial does not support the Bankruptcy Judge's decision. In her answers to the questioning by the Bankruptcy Judge, Ms. Rembert testified as follows:

Q. *Judge:* And let me just ask you this— this important question: *At the time you were borrowing this money for gambling,* $18,000 to $24,000 in this six or seven month period, how did you think you were going to be able to pay it back?

A. *I thought I was going to win.*

Q. Do you recognize now that that was not a reasonable expectation on your part?

A. Yes. I recognized it before now.

Q. When did you first recognize it?

A. In '95. I'll say when I knew I couldn't pay.

Q. When was that?

A. Maybe the spring of '95.

Q. But you had stopped gambling by then.

A. Yeah. I had to.

Trial Transcript at 54 (emphasis added).

Additional trial testimony by Ms. Rembert supports this Court's conclusion in favor of discharge:

if she had other debts and was getting in over her head?
A. No.
Trial Transcript at 76–77.
Q. [Appellant's attorney] And so never having run these checks, you assumed you'd be paid back, but you really had no idea, did you?

All the way until the end, I was trying to get my money back

. . .

I even tried to not file for bankruptcy.

*Trial Transcript at 37.*

Q. *Appellant's Attorney:* Did you ever take money from Citibank without intending to pay it back?

A. No.

Q. Did you ever take money from AT&T without intending to pay it back?

A. No.

Q. Okay. Did you assume, when you were gambling, and you were taking cash advances on that, you would win, and would be able to pay that money back?

A. I did.

*Trial Transcript* at 46.

Ms. Rembert testified that, at the time of her gambling she believed that her winnings would pay back her debts, and that she did not recognize that her expectation that she would repay was not reasonable until the spring of '95—well after her last cash advance (January, 1995). There is no evidence in the record to support the Bankruptcy Judge's finding that Appellant had the requisite fraudulent intent or intent to deceive at the time of the cash advances in question.

█ The fact that Appellant hoped to repay her debts through gambling winnings is not *per se* unreasonable. *In re Alvi,* 191 B.R. 724, 734 n. 19 (Bankr.N.D.Ill.1996) ("This Court knows of no legal rule which establishes that a debtor who hoped to win at gambling per se cannot show the requisite intent to repay."); *Chemical Bank v. Clagg,* 150 B.R. 697, 698 (Bankr.C.D.Ill.1993) ("There is no basis for treating a debt that arose from legal gambling any differently from other debts legally incurred.") The

A. Yes.
Q. Okay. And so by now knowing, you assumed a risk that maybe she wouldn't be able, didn't you?
A. That is correct.
Trial Transcript at 95.

court in *In re Alvi*, commented that, "If Congress intended for all debts incurred in connection with gambling to be found nondischargeable, it could have done so. It did not single out gambling debts for any special treatment in bankruptcy cases." 191 B.R. at 734 n. 19. Moreover, in *In re Chomakos v. Flamingo Hilton*, 69 F.3d 769 (6th Cir.1995), *cert. denied sub nom, Allard v. Hilton*, 517 U.S. 1168, 116 S.Ct. 1568, 134 L.Ed.2d 667 (1996), the Sixth Circuit, in considering whether gambling bets were voidable under the Bankruptcy Code, held that "[w]here gambling is lawful ... the placing of a bet gives rise to legally enforceable contract rights ..." and therefore is not a fraudulent conveyance. *Id.* at 771. The Court noted that if instead of gambling, the Chomakos had spent the money on expensive dinners, the creditors would have been no better off than they are now. *Id.* at 772.

Ms. Rembert gambled to win money, not to lose money. At the time of her gambling she hoped to pay off her debts with gambling winnings. The fact that she did not win does not label her a fraudulent offender. By gambling, she was acting in a manner that could have resulted in her being able to pay off her gambling debts. Would Appellees have rejected payment if she had paid off her debts with earnings from legal gambling activity? Certainly not! Her conduct was consistent with her testified-to intent at that time—an intention to pay off her credit card debts.

Gambling is a risky investment. But so too is trying to start a successful small business, or investing in derivatives, or investing in heating oil futures or penny stocks. These are all risky endeavors that most of the time do not pan out. Unfortunately, bankruptcy is the route taken by many individuals whose risky investments do not pan out. If the risky investment succeeds, the lenders, be they credit card companies or banks are made whole. If the investment fails, then their risk does not pay off. That the credit card company's risk in advancing money does not pan out does not turn the debtor into an individual guilty of defrauding the creditor.

There is no basis for finding that Ms. Rembert made a false representation to Appellees when she incurred debts in the latter part of 1994. There is no evidence that she had sought bankruptcy on a prior occasion. There is no evidence that she had a history of obtaining funds and not repaying them. The Appellees have not met their evidentiary burden. They did not provide the preponderance evidence necessary to support the Bankruptcy Judge's factual findings.

■ This Court has based its decision upon direct evidence—Ms. Rembert's testimony and the other evidence before the Bankruptcy Judge. In the absence of direct evidence, some *courts* consider twelve factors [7] in determining the existence of intent. See *In re Alvi, supra*. This Court rejects this twelve factor test in analyzing the instant case, finding that they fail to address the subjective intent of the debtor necessary for a finding of fraud: "[d]ebtors can honestly, but mistakenly, believe that they have the ability to repay their debts .... the Court cannot require the Debtor to have a[sic] objectively reasonable basis for his belief[.]" 191 B.R. at 733.

The Bankruptcy Court in the instant case did not apply the twelve factors because it concluded that Appellant's trial testimony provided a preponderance of evidence supporting a finding of the requisite fraudulent intent. This Court agrees that there is no reason to apply the twelve factor test, but for the opposite reason—because Appellant's trial testimony impelled a clear finding of no fraudulent intent.[8]

7. The twelve factors are: (1) the length of time between the charges were made and the filing; (2) whether a bankruptcy attorney was consulted before the charges were made; (3) the number of charges made; (4) the amount of the charges; (5) the debtor's financial condition at the time the charges were made; (6) whether the charges were above the credit limit; (7) whether the debtor made multiple charges on the same day; (8) whether the debtor was employed; (9) the debtor's prospects for employment; (10) the financial sophistication of the debtor; (11) whether there was a sudden change in the debtor's buying habits; (12) whether the purchases were made for luxuries or necessities. *In re Johnny Mac Roberts*, 193 B.R. at 831.

8. This Court notes, in dicta, that application of the 12 factors to the instant case, would not establish by a preponderance of evidence, fraudulent intent on the part of Appellant:

A recent decision by the United States Court of Appeals for the Ninth Circuit rejected a claim of fraud by credit card companies against a bankrupt who had sought discharge of debts from gambling activities; "the bankruptcy court was clearly erroneous in finding an intent to defraud." *Anastas v. American Savings Bank,* 94 F.3d 1280 (9th Cir.1996). The Ninth Circuit decision stated:

> [T]he central inquiry in determining whether there was a fraudulent representation is whether the card holder lacked an intent to repay at the time he made the charge.

> We emphasize that the representation made by the card holder in a card transaction is not that he has an ability to repay the debt; it is that he has an intention to repay.

> . . . .

> Obviously, Anastas had a serious gambling problem. Although it may have been unlikely that he could win back the money to be able to pay back the cash advances that financed the gambling, the record fully supports Anastas' good faith intention to do so. There is no basis in the record for a finding of the type of malicious and bad faith intent not to repay that is necessary for a finding of actual fraud under section 523(a)(2)(A). *Id.* at 1287.

(1) Appellant filed for bankruptcy on April 20, 1995, four months after the last cash advance in question.

(2) She did not contact an attorney until after she stopped using the credit cards.

(3) & (4) The amount of cash advances was higher than usual.

(5) & (6) While Appellant's financial condition at the time of the charges was not good, there was evidence that she had continuously sought to pay on her credit card debt. There was no clear trial testimony with respect to the actual limits on all of Appellant's cards, and whether or not she exceeded them from November 1994 until January 1995.

AT&T Investigations Manager Paul Patterson testified that in mid-November, 1994, Ms. Rembert had paid off her entire debt of $3,015.86 on one of the AT&T cards (account # 2176). Trial Testimony, at 71. Ms. Rembert continued to gamble and lose, and the total debt on both AT&T credit cards rose to about $5,700 by the end of December, 1994. Patterson testified that Appellant had made a subse-

*Conclusion:*

For the reasons stated above, the Court REVERSES the ruling of the Bankruptcy Court in the adversary proceedings brought by Citibank South Dakota and AT&T Universal Card Services, and finds the credit card debts at issue to be dischargeable under 11 U.S.C. § 523(a)(2)(A).

SO ORDERED.

quent payment of about $700 on that debt during the period after her gambling ceased and before she filed for bankruptcy. *Id.* at 73, 75. Patterson further acknowledged that Ms. Rembert maintained a record of consistent monthly payments to AT&T until January, 1995. *Id.* at 76.

(7) Appellant did make multiple charges on the same day.

(8) & (9) Appellant was employed at all relevant periods in the case.

(10) There is no evidence that Ms. Rembert was financially sophisticated. Her securing of a second mortgage on her house in November, 1994, evidenced a desire to pay on her debts, not financial sophistication to maintain a scheme.

(11) Appellant's charging habits changed; she sought more cash advances in November and December, 1994.

(12) Almost every charge at issue was used in gambling, which is not a necessity, but is a legal use of the funds.