In re Glenn L. PATTEN, Debtor.

Ryan C. STILL, Plaintiff,

v.

Glenn L. PATTEN, Defendant.

Bankruptcy No. 697–64178–fra7.
Adversary No. 97–6351–fra.

United States Bankruptcy Court,
D. Oregon.

Sept. 25, 1998.

CITATION

Mark B. Comstock, Salem, OR, for Plaintiff.

James J. MacAfee, Salem, OR, for Defendant.

## MEMORANDUM OPINION

FRANK R. ALLEY, III, Bankruptcy Judge.

This is an action by a customer against a now defunct automobile dealer, seeking a judgment for money damages, and a declara-

tion that the award is not dischargeable. I find for the Plaintiff.

## I. BACKGROUND

Plaintiff purchased a used 1996 Chevrolet 2500 Series pickup from the Defendant/Debtor, a used car dealer. The sale price was $25,040, which included a $10 license and registration fee and a $35 "administration fee" charged by the dealer. A $6,995 credit was given for the Plaintiff's trade-in (a 1988 Chevrolet Blazer). The balance of $18,045 was to be financed by a loan from Portland Teachers' Credit Union (PTCU).

Plaintiff took delivery of the pickup, and surrendered the Blazer, on January 18, 1987. At that time the pickup was subject to a security interest in favor of Wells Fargo Bank, and a debt of $24,633.

On January 22, 1997 Portland Teachers' Credit Union issued its check for $18,045, payable to Ryan C. Still and Patten Motors. Mr. Still endorsed the check and delivered it to a salesman at Patten Motors. Mr. Still testified that, at that time, he was reassured that the funds would be used to obtain clear title to the pickup, which would be forthcoming in approximately six weeks.

The check was deposited in Debtor's checking account on January 22.[1] On January 24, Debtor made a $991.30 payment to Wells Fargo, constituting two monthly installments. The source of the payment is not clear, although it is evident from the bank records that it did not come from the Debtor's business checking account. Debtor testified that he made the payment in order to keep the obligation to Wells Fargo from going into default. No other payments were made to Wells Fargo.

At the time of the payment, Debtor's cash on hand, including the payment, was insufficient to pay the Wells Fargo lien plus the liens on previously sold vehicles. He was also running short of funds for his household, and had recently missed several house payments. The balance of the cash then available to Debtor was used to discharge encumbrances on cars which had been sold previously to other customers. Debtor testi-

1. Apparently this checking account was the Debt- or's only business bank account.

fied that he intended to discharge the encumbrance to Wells Fargo securing the Plaintiff's new vehicle with the proceeds of subsequent sales. He acknowledged that it had been his regular business practice for some years to pay lienholders on vehicles sold to new owners roughly 30 days after the sale, using the proceeds of subsequent sales to do so. His practice was to write out a check for the amount required to payoff the encumbrance, place it in an envelope, and hold it for delivery to the lienholder until he had deposited enough money from subsequent sales to cover the check. Debtor acknowledges that his habitual failure to obtain clear title violated ORS 822.045.[2] In this case he wrote out a check to Wells Fargo on February 9, in the sum of $24,633.24, but did not deliver it.

At roughly the same time the Oregon Department of Motor Vehicles (DMV) was investigating the Debtor's financial practices. As a result of that investigation, the DMV served an order on February 21, 1997 requiring the immediate surrender of the Debtor's dealers license, and suspending his right to do business as an automobile dealer in Oregon for three years.[3] This had the effect of interrupting the cash flow necessary for the acquisition of funds to clear encumbrances on previously sold vehicles. This meant that there were insufficient funds to cover the previously written check to Wells Fargo,

which was never paid. Fourteen months after the original sale Wells Fargo repossessed the vehicle without prior notice to Plaintiff.

Plaintiff argues that Debtor is indebted to him for the amount Plaintiff borrowed from PTCU, which amount is still owed, plus the value of improvements made to the truck before it was repossessed, and the value of the trade-in. He claims other consequential damages, including time lost from work on the day of the repossession, and $2,600 paid for a replacement vehicle. He further alleges that the claim is exempt from discharge on the following theories:

1. That the debt is based on actual fraud, and exempt from discharge under Code § 523(a)(2). The alleged misrepresentation was that the proceeds of the credit union loan and the value of the trade-in would be used to obtain clear title, which necessarily meant paying off the Wells Fargo lien. Instead, the funds were used to pay off other obligations of the Debtor.

2. That the dealer acted in a fiduciary capacity, and that the use of the loan proceeds to pay off encumbrances in unrelated transactions was a defalcation exempt from discharge under § 523(a)(4). Alternatively, it is argued that the misuse of the funds was an act of embezzlement or larceny.

3. Finally, that the conscious decision to pay other encumbrances prior to the one

---

**2.** ORS 822.045 provides, in part:

(1) A vehicle dealer improperly conducts a vehicle dealer business and is subject to the penalties under this section if the vehicle dealer commits any of the following offenses:

\* \* \* \* \* \*

(k) A vehicle dealer commits the offense of failure to provide clear title if, within 15 days of transfer of any interest in a vehicle or camper by the dealer the dealer fails to satisfy:

(A) The interest of any person from whom the dealer purchased or obtained the vehicle or camper;

(B) The interest of any person from whom the person described in paragraph (A) of this paragraph leased the vehicle or camper; and

(C) All security interests in the vehicle or camper entered into prior to the time of the transfer.

The offense is a Class A misdemeanor. ORS 822.045(3)(k). Another provision makes it a misdemeanor to fail to provide a certificate of title within 90 days. ORS 822.045(3)(L). A dealer is

deemed not to have violated ORS 822.045(3)(L) if he has made a good faith effort to comply, and his inability to comply was due to circumstances beyond his control. ORS 822.045(2)

**3.** Oregon Administrative Rule 735–150–0100 provides:

(1) A person shall be subject to immediate suspension of their dealer's certificate for a period not to exceed three years if the person creates a serious danger to the public health and safety, including but not limited to lost or diminished economic interest, security interest or ownership interest in vehicles by the public through the transaction of business with the person.

(2) Any person whose dealer's certificate has been suspended under this rule shall be granted an opportunity for a contested case hearing as provided in the Oregon Administrative Procedures Act (ORS Chapter 183), except that the provisions of OAR 735–150–0120(7) shall apply.

Debtor did not seek a hearing regarding the decision to suspend his license.

securing the vehicle purchased by Plaintiff was a willful and malicious injury to Plaintiff's property interests, and exempt from discharge under § 523(a)(6).

Debtor argues that he was engaged in a regular trade practice which, if not strictly in compliance with the Oregon Motor Vehicle Code, was nevertheless commonplace, and not fraudulent. He further argues that any representation made by Plaintiff's salesman cannot be imputed to him in this context. Debtor asserts that he did not act in a fiduciary capacity, and that he had no intention of injuring the Plaintiff. In fact, Debtor maintains that he acted at all times in good faith and without intent to injure. The heart of his argument is that, but for the fact that the State closed his business, he would have paid the obligation secured by Plaintiff's pickup truck in what amounted to the ordinary course in his business.

## II. ANALYSIS

*1. False pretenses, false representation, or actual fraud*

§ 523(a)(2)(A) exempts from discharge debts:

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition....

■ "False pretenses" or "false representation" both involve intentional conduct intended to create and foster a false impression. *See* Collier on Bankruptcy ¶ 523.08[1][d] (15th Ed.1998). The distinction is that a false representation involves an express statement, while a claim of false pretenses may be premised on misleading conduct without an explicit statement. *In re Scarlata,* 127 B.R. 1004 (N.D.Ill.1991); *Matter of Haining,* 119 B.R. 460 (Bankr.D.Del.1990). There is no significant difference, however, between the terms "false pretenses," "false representation," and "actual fraud." Fraud includes false pretenses and false representation for dischargeability purposes. *See* 3 Norton Law and Practice 2d § 47:15 n.16.

Elements of actual fraud are (1) a representation by the debtor; (2) known by the debtor to be false; (3) made with the intent to deceive the creditor; (4) reliance by the creditor; and (5) damage to the creditor as a result of the representation. *In re Apte,* 96 F.3d 1319, 1322 (9th Cir.1996). Reliance by the creditor must be justifiable, rather than reasonable. *Id.* (citing *Field v. Mans,* 516 U.S. 59, 72–75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995)). Plaintiff must prove each of these elements by a preponderance of the evidence. *In re Eashai,* 87 F.3d 1082, 1086 (9th Cir.1996)(citing *Grogan v. Garner,* 498 U.S. 279, 286–287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)).

■ At the time he delivered the credit union check to the Debtor, Plaintiff was told by Debtor's agent that the money would be used to clear the title on the pickup Plaintiff had just purchased. This, by itself, satisfies the false representation element, since Debtor had no such intention. Moreover, the law required that the existing lien be satisfied within 15 days. It is implicit in this requirement that the seller use the funds received from the buyer, or have ready access to the funds necessary to clear title.

■ Debtor argued at trial that any actual representation was made by the salesman, and not the Debtor. However, the salesman was acting within his authority as Debtor's agent. An agent's misrepresentations are imputed to his principal for discharge purposes if the misrepresentation was known to the principal. *Matter of Walker,* 726 F.2d 452 (8th Cir.1984). Debtor's salesman was acting consistently with Debtor's business practices, and Debtor is bound to the consequences of those actions.

■ In determining whether there was an intent to defraud, the court must examine the totality of the circumstances. *In re Eashai,* 87 F.3d 1082 (9th Cir.1996). The court may infer the existence of an intent not to perform, sufficient to satisfy the false pretenses or fraud exceptions, if the circumstances of a case present a "picture of deceptive conduct by the debtor." *Id; In re Hashemi,* 104 F.3d 1122 (9th Cir.1997). Here the Debtor accepted Plaintiff's trade-in

at a time when he did not have the funds available to pay the encumbrance on the product sold, and simultaneously discharge the same duty he owed to prior customers. While he claims that he intended to satisfy his obligation under his contract with Plaintiff, Debtor knew that he could only do so by continuing a business practice that he knew, or should have known, was unlawful. Debtor's undertaking of a lawful obligation with the knowledge (unknown to the buyer) that Debtor could perform only by resorting to unlawful means was fraudulent, for two reasons. First, the Debtor cannot, as a matter of law, establish a claim of intent to repay by unlawful means. Second, Debtor was chargeable with the knowledge that the State could interrupt his cash flow by suspending his license for the very business practices he was depending on. This is, in fact, exactly what happened.

A fraud is not diminished by an aspiration to make the victim whole by defrauding someone else in the future. Nor is the fraud made any less by the fact that Plaintiff was the injured party because of bad timing and intervening events. Sooner or later someone was going to be burned by Debtor's methods, since sooner or later either the law or nature would put an end to Debtor's cash flow. The only way out was the accumulation or infusion of enough capital to cover Debtor's obligations to customers as they arose. There is no evidence to suggest that Debtor had the means or the will to take that course.

Debtor presented testimony to the effect that the State's enforcement action was unprecedented, and the result either of selective prosecution because his wife worked for the DMV, or because of a new policy of strict enforcement resulting from recent adverse publicity regarding practices such as the ones described above. I do not believe these circumstances to be material. Debtor is chargeable with knowledge of Oregon law regulating the conduct of automobile dealerships, and specifically the requirement that encumbrances against sold vehicles be cleared within 15 days of the date of sale. Conduct of an unlawful business practice is not mitigated by an expectation, even if realistic, that the law will not be effectively enforced. Likewise, reliance on the unlawful practice does not allow Debtor to avoid Plaintiff's fraud claim.

As to the remaining elements, I find that Plaintiff justifiably relied on Debtor's representations, and that Debtor's fraudulent actions were the proximate cause of Plaintiff's injuries, as discussed below. The debt is excepted from discharge.

2. *Defalcation by fiduciary, embezzlement, or larceny*

█ § 523(a)(4) excepts from discharge debts incurred by "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Plaintiff makes two claims under this section: first, that Debtor embezzled the funds, and, second, that he was acting in a fiduciary capacity, and that his misuse of the funds was a "defalcation."

█ Debtor was not acting in a fiduciary capacity. As noted, the Oregon Motor Vehicle Code requires payment of encumbrances on sold vehicles with a fixed period of time. However, nothing in the Motor Vehicle Code requires that the particular funds paid by a buyer be earmarked for his particular purchase.[4] The source of funds used to clear the title is immaterial, so long as it gets done. Whether a person acts in a fiduciary capacity under § 523(a)(4) is a question of federal law. *In re Lewis*, 97 F.3d 1182, 1185 (9th Cir.1996). The relationship must have existed prior to the alleged wrongdoing, and exist independently of the misconduct. *Id.* at 1185. The Motor Vehicle Code does not create a trust with respect to funds tendered to a dealer, and does not provide the basis of a fiduciary relationship. *See American Ins. Co. v. Lucas*, 41 B.R. 923 (Bankr.W.D.Pa.1984) (Debtor authorized to sell hunting licenses who failed to remit fees to state did not hold such fees as a fiduciary, even though state law required earmarking of funds.)

█ Embezzlement in the context of § 523(a)(4) is "the fraudulent appropriation

---

4. Which is not the same as saying that a dealer should not accept payment when he lacks the means of discharging the lien as required by ORS 822.045(1)(k).

of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *In re Littleton,* 942 F.2d 551 (9th Cir.1991). Embezzlement requires that property rightfully be in the possession of a nonowner. *Id.* In this case Debtor, once paid by Plaintiff, was the owner of the funds, even though his receipt of them imposed the duties described above. The embezzlement claim is not satisfied under these facts.

*3. Intentional injury to property interest*

 § 523(a)(6) exempts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." In a recent decision the United States Supreme Court held that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger,* —— U.S. ——, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). In short, Plaintiff must demonstrate that Debtor intended to injure the Plaintiff. In fact, Debtor's intention was to continue his business, with all its faults, and pay off the Wells Fargo lien when he could. The circumstances of this case reveal fraudulent conduct, but do not demonstrate the sort of specific intent to injure required by *Geiger.*

*4. Measure of damages*

 The pickup truck was repossessed because Debtor failed in his duty to pay the obligation to Wells Fargo secured by the truck. However, Plaintiff remains liable on the debt he incurred to the credit union. In addition, he has lost the value of the vehicle traded in, which was valued at $6,995 by the parties at the time of the sale. In all, Plaintiff claims the following damages:

| | |
|---|---|
| – Principal balance of PTCU loan: | $18,045.00 |
| – Payments (principal and interest) on PTCU loan | 5,194.00 |
| – Value of trade-in | 6,995.00 |
| – Value of tires and accessories added to pickup | 1,209.31 |
| – Replacement Vehicle | 2,600.00 |
| – Two day's lost income | 400.00 |
| – Insurance on pickup | 1,190.00 |
| TOTAL | $35,233.31 |

Not all of these items are recoverable from Debtor. Specifically:

— Plaintiff presumably still owns the replacement vehicle, or has sold it. Either way, he has benefitted from its use to the extent of any depreciation. While he might have had other uses for the cash spent to buy the second truck, he nevertheless has either retained or recovered its value.

— Plaintiff cannot recover both the original balance of the loan and the subsequent principal payments. He is entitled to interest paid on the loan. An "advance voucher" from the credit union submitted by Plaintiff discloses a loan rate of 8.25% per annum, and a monthly payment of $371. Plaintiff made 14 payments. Assuming ordinary means of amortization, $3,565.82 of the payments was allocated to principal, and $1,628.18 to interest.

— The insurance claim cannot be recovered. Any unearned premium could have been recovered by cancellation of the policy. To the extent premiums were earned though provision of liability and other coverage while the car was in Plaintiff's possession, he has actually benefitted thereby, and has not suffered any loss.

— The lost income is not a foreseeable loss in this context. Moreover, the testimony was equivocal as to whether the amount claimed was actually payable for the time in question.

Each of the remaining items of damage were the proximate result of debtor's fraudulent conduct. Plaintiff's damages payable by Debtor are as follows:

| | |
|---|---|
| – Principal balance of PTCU loan: | $18,045.00 |
| – Interest paid on loan | 1,628.18 |
| – Value of trade-in | 6,995.00 |
| – Value of tires and accessories added to pickup | 1,209.31 |
| TOTAL | $27,877.49 |

### III. CONCLUSION

Debtor sold an encumbered vehicle to Plaintiff knowing he lacked the present ability to provide clear title within the time required by law, and knowing that he could only do so by further violation of his obligations to prior customers, or by engaging in new violations with respect to new custom-

**218**

ers. Such conduct is fraudulent for the purposes of Code § 523(a)(2)(A). As a result of this conduct, Debtor is indebted to Plaintiff in the sum of $27,877.49. Plaintiff is entitled to entry of judgment of that amount, together with his taxable costs and statutory interest from the date of judgment. The debt was incurred through Debtor's fraudulent conduct, and is not subject to discharge.

The foregoing constitutes the court's findings of fact and conclusions of law, which will not be separately stated. Counsel for Plaintiff shall submit a form of judgment consistent with this memorandum opinion.