In re Ghalib **ALNAJJAR, Debtor.**

**Chase Manhattan Bank, Plaintiff,**

v.

**Ghalib J. Alnajjar, Defendant.**

No. 01–3102.

United States Bankruptcy Court, N.D. Ohio.

Jan. 16, 2002.

Steven M. Burke, Sylvania, OH, for defendant.

Richard J. Szczepaniak, Toledo, OH, for plaintiff.

### MEMORANDUM OPINION
### AND DECISION

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court after a Trial on the Plaintiff's Complaint to Determine Dischargeability. At the Trial held on this matter, the Parties were afforded the opportunity to present evidence and make any arguments that they wished the Court to consider in reaching its decision. This Court has now had the opportunity to review the arguments of Counsel, the exhibits, as well as the entire record of the case. Based upon that review, and for the following reasons, the Court finds that the debts at issue herein are dischargeable.

### FACTS

The Plaintiff, Chase Manhattan Bank (hereinafter referred to as the "Plaintiff"), is in the business of issuing and financing credit card transactions. As a part of this business, the Plaintiff in or around April of the year 2000 purchased, as part of a bulk transaction, a credit card account in the name of the Defendant/Debtor, Ghalib Alnajjar (hereinafter referred to as the "Debtor"). The facts presented in this case show that the Debtor was in no way involved in this transaction.

At the time the Debtor's credit card account was purchased, it appears that the Debtor was current on his obligation to the Plaintiff. In this respect, a billing statement provided to the Court from June of the year 2000 revealed that the Debtor, after having made two payments totaling over Six Hundred dollars ($600.00), had a zero balance on his credit card account with the Plaintiff. In the succeeding months, however, the evidence presented in this case shows that the Debtor began to incur rather significant charges on his account with the Plaintiff. In particular, the billing statements provided to the Court for those months immediately following June of the year 2000 reveal that up until the time the Debtor made his last credit transaction on October 13, 2000, the Debtor became indebted to the Plaintiff for almost Twelve Thousand dollars ($12,-000.00). The basis for this indebtedness can be broken down into four different components.

First, in June and July of the year 2000 the Debtor incurred Two Thousand Six Hundred Thirty-six and 42/100 dollars ($2,636.42) in credit card charges when he went on a trip to the country of Jordan. The Debtor explained that the purpose for this trip was to visit family. Second, on October 9, 2000, the Debtor made a balance transfer of Three Thousand Two Hundred Twelve dollars ($3,212.00) from a credit card account he maintained with another company to his account with the Plaintiff. According to the evidence presented in this case, this transaction was initially solicited by the Plaintiff who, through the promise of a lower interest rate, encouraged this balance transfer. The third type of debt involved in this case concerns certain minor purchases together with a few miscellaneous finance charges which were incurred by the Debtor; these debts in all totaled Eight Hundred Fifty-seven and 81/100 dollars ($857.81).

The fourth and final component of the Debtor's credit card debt, and the one which lies at the heart of the matter, involves the following cash advances which were taken by the Debtor at various casinos in Detroit, Michigan:

| | |
|---|---|
| 8–20–2000 | $ 530.99 |
| 8–20–20006 | $1,051.99 |
| 8–28–2000 | $1,051.99 |
| 9–3–2000 | $ 530.99 |
| 9–24–2000 | $ 317.99 |
| 9–24–2000 | $ 525.99 |
| 9–30–2000 | $ 530.99 |
| 10–13–2000 | $ 530.99 |
| Total | $5,071.92 |

With respect to these transactions, the Debtor admits that all the money he received on credit from the Plaintiff was lost in playing games of chance. It was also brought to the Court's attention that, in addition to losing his own money, the Debtor had also lost, at the Detroit Casinos, money obtained from other credit card companies.

In explaining his gambling losses, the Debtor related to the Court that he continued to bet money in the hope that he could win back his initial losses. Further, according to the Debtor, this desire to win his initial money back caused him to lose control over his behavior. The Debtor, however, stated that notwithstanding his gambling losses, he still had every intention of paying the Plaintiff back for the money that he had obtained on credit. In support of this position, the Debtor asserted that his bankruptcy filing was caused not by his mounting gambling losses, but instead by the loss of his job. The specific circumstances surrounding this assertion were presented to the Court as these:

In July of the year 2000, the Debtor obtained a job as a truck driver with a company known as Sylvester Material Companies; in this capacity, the Debtor worked between 40 and 50 hours per week at an hourly salary of Fourteen dollars ($14.00) per hour. This job, according to the Debtor, provided him with a sufficient amount of disposable income to service his credit card obligations. (It was also set forth that at this time, the Debtor's monthly rent stood at just $375.00 per month.) The Debtor, however, explained that his job with Sylvester Material Companies was conducted on a notice basis; that is, he was informed on a periodic basis of if and when to report to work. In this regard, the Debtor testified that on October 6, 2000, he was told not to report to work the following week. Although the Debtor contends that it was not known to him at the time, this layoff turned out to be permanent in nature. As a result, the Debtor stated that he was forced to obtain another job at a considerable cut in pay.

The Plaintiff, however, while not disputing the Debtor's loss of a job, argues that sufficient badges of fraudulent behavior exist in this case for this Court to make a finding that the Debtor's credit card obligations should be found to be nondischargeable debts under the fraud exception to discharge contained in § 523(a)(2)(A). The Plaintiff's position relies primarily on the premise that, without the ability to service his credit transactions, the Debtor ran up a considerable amount of gambling debt in the period immediately preceding the filing of his bankruptcy petition, an event which occurred on January 22, 2001. (PreTrial Brief of Plaintiff, at pg. 4). As support for this position, the Plaintiff called this Court's attention to the lack of regular remunerations made by the Debtor once he began to incur his gambling debt. In this respect, it is not disputed that over the course of a five-month period of time—from July to November of 2000—the Debtor made only three minor payments on his credit card debt: One Hundred Thirty-six and 42/100 dollars ($136.42) on August 15, 2000; Sixty-two dollars ($62.00) on September 19, 2000; and Twenty dollars ($20.00) on November 10, 2000. Furthermore, the Plaintiff asserts that its reliance on the Debtor's representations of repayment were justifiable given that the Debtor "incurred the credit advancements in such a short period of time, the Plaintiff could not verify the ability of the [Debtor] to repay the indebtedness." (PreTrial Brief of Plaintiff, at pg. 4).

### LAW

**11 U.S.C. § 523. Exceptions to Discharge.**

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

### DISCUSSION

The Plaintiff in this case seeks a determination that the claim it holds against the Debtor is a nondischargeable obligation pursuant to § 523(a)(2)(A) of the Bankruptcy Code. As such a determination concerns the dischargeability of a particular debt, this matter is a core proceeding over which this Court has been conferred with the jurisdictional authority to enter final orders. 28 U.S.C. § 157(b)(2)(I).

Section 523(a)(2)(A) excepts from discharge those debts which were incurred

by fraudulent means. It is well-established that a creditor who seeks to invoke this section must establish the existence of the following elements: (1) the debtor made false representations; (2) the debtor knew such representations to be false at the time they were made; (3) the representations were made with the intent to deceive the creditor; (4) the creditor relied on the representations; and (5) the creditor's loss was the proximate result of the misrepresentation having been made. *Bernard Lumber Co. v. Patrick (In re Patrick)*, 265 B.R. 913, 916 (Bankr. N.D.Ohio 2001). As is typical in many cases brought under § 523(a)(2)(A), the focus in the present case is on the third and fourth elements of the above test: intent to defraud and reliance. For purposes of this Opinion, the Court will begin its analysis with whether the Debtor acted with the requisite intent to defraud the Plaintiff. Before conducting this analysis, however, the Court begins by noting that the burden to prove this requirement, as with all of the other elements under § 523(a)(2)(A), is placed upon the creditor as the party contesting the dischargeability of the debt. *Starr v. Reynolds (In re Reynolds)*, 193 B.R. 195, 200 (D.N.J.1996). The evidentiary standard therefore is a preponderance of the evidence. *Still v. Patten (In re Patten)*, 225 B.R. 211, 215 (Bankr.D.Or. 1998).

Central to the concept of fraud under § 523(a)(2)(A) is that the notion that the misfeasor must have acted with the intent to harm or deceive the injured party. This requirement, however, has created some difficulty in a situation, such as this, where a credit card is utilized. This difficulty arises because unlike typical credit transactions which are between two parties, credit card transactions normally involve three parties: (1) the debtor/card holder; (2) the creditor/card issuer; and (3) the merchant who honors the credit card. The existence of this arrangement, however, makes it difficult for the creditor to establish that the debtor made an intentional misrepresentation as normally the creditor has had no direct contact with the debtor. *Citibank (South Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1087 (9th Cir.1996). To overcome this difficulty, courts have applied various legal theories to credit card transactions under § 523(a)(2)(A).

Of the legal theories applied to credit card transactions, this Court originally adopted the theory known as the "implied representation" test. *Mid–American National Bank & Trust Co. v. Higgs (In re Higgs)*, 39 B.R. 181, 184 (Bankr.N.D.Ohio 1984); *First Deposit Nat'l Bank v. Gonzales (In re Gonzales)*, 213 B.R. 990, 993 (Bankr.N.D.Ohio 1996); *Fifth–Third Bank of Northwest Ohio, N.A. v. Spitler (In re Spitler)*, 229 B.R. 1, 4 (Bankr.N.D.Ohio 1998); *Chase Manhattan Bank v. Robinson (In re Robinson)*, 238 B.R. 681, 685 (Bankr.N.D.Ohio 1999); *AT & T Universal Bank v. Pennell (In re Pennell)*, 238 B.R. 737, 741 (Bankr.N.D.Ohio 1999). This theory, which has been very widely adopted, holds that a credit card holder impliedly represents, upon using a credit card, that he has *both* the ability and the intention of paying for the goods and/or services that are obtained on credit. *Sears Roebuck & Co. v. Faulk (In re Faulk)*, 69 B.R. 743, 752 (Bankr.N.D.Ind.1986); *Maas Bros., Inc. v. Ratajczak*, 5 B.R. 583, 586 (Bankr. M.D.Fla.1980). The application of this theory, however, has been subsequently overruled by the Sixth Circuit's decision in *Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277 (6th Cir.1998).

■ The *In re Rembert* case, like the circumstances which exist in the instant case, involved the dischargeability of gam-

bling debts which were incurred on a credit card. In finding the Debtor's credit card debts dischargeable, the Sixth Circuit stated as follows:

> We believe that the representation made by the cardholder in a credit card transaction is not that he has an ability to repay the debt; it is that he has an intention to repay. To measure a debtor's intention to repay by her ability to do so, without more, would be contrary to one of the main reasons consumers use credit cards: because they often lack the ability to pay in full at the time they desire credit. Further, the language of § 523(a)(2)(A) expressly prohibits using a statement respecting the debtor's or an insider's financial condition as a basis for fraud.
>
> \*\*\*\*\*
>
> Thus, we hold that the proper inquiry to determine a debtor's fraudulent intent is whether the debtor subjectively intended to repay the debt.

*Id.* at 281 (internal quotations and citations omitted). As the above holding clearly shows, the Sixth Circuit's application of § 523(a)(2)(A) to credit card debts completely discounts—in contravention to the "implied representation" theory—the debtor's present ability to pay, and instead focuses solely on the debtor's subjective intent at the time the debt in question was incurred. In doing so, the Sixth Circuit has ostensibly adopted what has become to be known as the "common law" test.[1] This test, which is purely subjective in nature, holds that dischargeability questions are not to be decided by a factor-oriented inquiry, but are instead to be decided by the court simply looking to all the facts and circumstances as they exist in this case. *American Express Travel Related Services Company, Inc. v. McKinnon (In re McKinnon)*, 192 B.R. 768, 775–76 (Bankr. N.D.Ala.1996); *See also Maya Hoffman, A Game of High Stakes Roulette: Credit Card Companies Cash in on Gamblers' Bad Luck,* 32 J. Marshall L.Rev. 1197 (1999).

An inherent weakness, however, in the "common law" approach is that it is very difficult, on a subjective basis, to prove that a debtor acted with the actual intent to defraud the creditor. This problem is compounded even further when gambling debts are involved as gamblers play to win. In fact, as pointed out in *L.A. Capitol Fed. Credit Union v. Melancon (In re Melancon):* "the more compulsive or addicted the gambler is, the more fervent her hope of winning, and therefore the more solid her intent to repay; but the more addicted she is, the less chance (way below zero) that she would use [her] winnings to repay." 223 B.R. 300, 338 (Bankr.M.D.La. 1998). In addressing these issues and concerns, the Sixth Circuit in *In re Rembert* explained:

> We are not unsympathetic to Appellants' claim that a subjective analysis of a

---

1. The other tests applied to credit card debts under § 523(a)(2)(A) are the "assumption of the risk" theory and the "totality of the circumstances" theory. Under the "assumption of the risk" theory, a credit card user will only be found to have intentionally made a false representation when three conditions are met: (1) the credit card has been revoked; (2) revocation of the card has been communicated to the card holder; and (3) the card holder continues to use the card. *First Nat'l Bank v. Roddenberry,* 701 F.2d 927, 932–33 (11th Cir.1983). This approach, which very often results in the dischargeability of credit card debts, has not been widely adopted. The "totality of the circumstances" theory holds that a debtor's intent to repay a debt must be inferred from the totality of the circumstances. Under this test, courts use a list of objective factors (i.e., badges of fraud) to determine if a debtor acted in a fraudulent manner. *Chevy Chase Bank FSB v. Kukuk (In re Kukuk),* 225 B.R. 778, 786 (10th Cir. BAP 1998).

debtor's fraudulent intent is extremely difficult to establish. Clearly, debtors have an incentive to make self-serving statements and will rarely admit an intent not to repay. In particular, compulsive gamblers often will have a subjective (albeit often baseless) intent to repay their gambling debts with their expected winnings, which is fueled by the very nature of their addictions. Thus, a debtor's intention—or lack thereof—must be ascertained by the totality of the circumstances. Some courts have adopted a nonexclusive list of twelve factors to consider when determining whether a debtor intended to repay the debt. Although we believe that factor-counting is inappropriate when applying a subjective standard, the enumerated factors could help to determine the debtor's state of mind when she represented her intention to repay. What courts need to do is determine whether all the evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent. This determination will require a review of the circumstances of the case at hand, but not a comparison with circumstances (a/k/a/ factors) of other cases.

141 F.3d at 282 (internal quotations and citations omitted).

■■■ Applying now the above standard to the case at hand, an initial review of the facts of this case reveals that the Debtor engaged in a course of conduct that is very indicative of a debtor who never had the intention of repaying their debts. In particular, it is very problematic to the Court that the Debtor obtained large cash advances over a short period of time so as to fund a gambling habit. Further compounding this problem is the Debtor's lack of meaningful payments to the Plaintiff at the time the Debtor's gambling debts were being incurred. Notwithstanding, debts incurred from gambling do not create a nondischargeable obligation per se. *Rembert v. AT & T Universal Card Servs., Inc.*, 219 B.R. 763, 767 (Bankr.E.D.Mich. 1996) (the fact that a persons hopes to repay their debts through gambling winnings is not per se unreasonable). Thus, the above considerations must be set against other facts in this case which would explain the Debtor's behavior in nonfraudulent terms.

Of utmost importance in this regard is the Debtor's termination of his credit card use shortly after he was let go from his employment with Sylvester Material Companies. In fact, the only charge made by the Debtor after he became unemployed occurred just seven days after the Debtor was laid-off. Moreover, the Debtor's one-time use of his credit card while unemployed can be explained by the fact that the Debtor did not immediately know that his lay-off would be permanent in nature. This use (or lack thereof) by the Debtor of his credit card, in this Court's judgment, exhibits a degree of responsibility, and thus lends credibility to the Debtor's assertion that he did not act in a fraudulent manner toward the Plaintiff.

Additional facts present in this case also point to the Debtor's lack of fraudulent intent. In particular, the Court notes that the cash advances the Debtor took for his gambling endeavors amounted to well less than 50% of his total credit card debt with the Plaintiff. Along this same line, none of the Debtor's other credit card debts seem out of the ordinary. For example, it would seem perfectly reasonable that a person, with a zero balance on their credit card, would make some charges on their credit card while on a trip overseas. In addition, it also seems very reasonable that a person, after being solicited to do so, would transfer credit card charges to a card with

a lower interest rate. Finally, the Court also observes that the Debtor did not actually file for bankruptcy relief until January 22, 2001, which was approximately three months after the Debtor incurred his last charge on his credit card with the Plaintiff.

After weighing the above considerations, the Court finds it credible that the actual catalyst in the filing of the Debtor's bankruptcy petition was not his gambling debts, but was instead the loss of his job. As a result, the Court, in weighing the evidence in this case following the standard set forth by the Sixth Circuit in *In re Rembert,* finds it more probable than not that the Debtor intended to repay his credit card debts to the Plaintiff at the time these debts were incurred. (Although not actually ruling on the matter, the Court notes that a different outcome may have been reached had the Court applied the "implied representation" theory to the circumstances of this case.) As a result, this Court holds that the Plaintiff has failed to sustain its burden under § 523(a)(2)(A). Having reached this determination, the Court at this time declines to address whether the Plaintiff's reliance on the Debtor's representations were justifiable as is required under the fourth element of the test set forth in § 523(a)(2)(A).

In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Opinion.

Accordingly, it is

**ORDERED** that the credit card obligations of the Defendant/Debtor, Ghalib Alnajjar, to the Plaintiff, Chase Manhattan Bank, be, and are hereby, determined to be DISCHARGEABLE DEBTS.